IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| STEPHEN W. NORFOLK and BRANDY M. NORFOLK, | ) ) ) | Case No. 3:17-cv-204 |
| | ) | JUDGE KIM R. GIBSON |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| THE GEO GROUP, INC., d/b/a MOSHANNON VALLEY CORRECTIONAL CENTER, | ) ) ) ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

I.     **Introduction**

This case arises from Defendant GEO Group, Inc.'s ("GEO") alleged racial discrimination

and acts of retaliation against Plaintiffs Stephen Norfolk and Brandy Norfolk in violation of Title

VII of the Civil Rights Act of 1964 ("Title VII") and the Pennsylvania Human Relations Act

("PHRA") while they worked at Moshannon Valley Correctional Center ("MVCC").   Pending

before the Court is Defendant's Motion for Summary Judgment.   (ECF No. 47.)   The Motion is

fully briefed (ECF Nos. 48, 51, 53, 58) and ripe for disposition.   For the reasons that follow, the

Court **DENIES** Defendant's Motion.

II.    **Jurisdiction and Venue**

This Court has subject-matter jurisdiction because Plaintiffs' Title VII claims arise under

federal law.   28 U.S.C. § 1331.   The Court has supplemental jurisdiction over Plaintiffs' PHRA

claims because those claims form part of the same case or controversy as their Title VII claims.   28

U.S.C. § 1367.  Venue is proper because a substantial portion of the events giving rise to Plaintiffs'

claims occurred in the Western District of Pennsylvania.  28 U.S.C. § 1391.

## III.   Factual Background

The following facts are undisputed unless otherwise noted.[1]

### A.  Mr. Norfolk Reports on Major Parrish

Mr. Norfolk, who is white, was hired as a Correctional Officer at MVCC in February 2006

and was promoted to the rank of Lieutenant in October 2012.  (ECF No. 49 ¶¶ 2–3.)  One of Mr.

Norfolk's supervisors at MVCC was Major Robert Parrish, who is African American.  (ECF No.

52 ¶ 64.)  All employees at MVCC, including Mr. Norfolk and Major Parrish, receive an employee

handbook, which sets out policies to abide by while working at MVCC.  (ECF No. 49 ¶ 15.)  One

of those policies, GEO Policy 3.2.2—Standards of Employee Conduct, states that the relationship

between MVCC staff members will be mutually respectful and professional.  (*Id.* ¶¶ 16–17.)

In December 2014, Mr. Norfolk reported Major Parrish's use of profanity towards him and

MVCC's emergency response team to Assistant Warden ("A.W.") Donald Emerson.  (ECF No. 49

¶¶ 20–21.)  On December 18, 2014, Major Parrish had yelled at Mr. Norfolk that "your Mother

Fuck'n staff can't keep their fuck'n mouths shut."  (ECF No. 52 ¶ 67.)  After Mr. Norfolk reported

Major Parrish's comment to A.W. Emerson, Major Parrish confronted Mr. Norfolk, saying: "Now

why did you go and do something like that?  What's wrong with your white ass?"  (*Id.*)  Mr.

---

[1] The Court derives these facts from a combination of Defendant's Concise Statement of Undisputed Material Facts in Support of Defendant's Motion for Summary Judgment (ECF No. 49), Plaintiff's Answer to Defendant's Statement of Material Facts and Counter-Statement of Material Facts Precluding the Entry of Summary Judgment (ECF No. 52), and Defendant's Reply to Plaintiff's Answer to Defendant's Statement of Material Facts and Counter-Statement of Material Facts Precluding the Entry of Summary Judgment (ECF No. 54).

Norfolk responded that he just told A.W. Emerson what happened at the meeting, and Major Parrish then stated, "Ya know, I'd fire someone for somethn like this." (ECF No. 52-2 at 1.) A.W. Emerson did not investigate Major Parrish's use of profanity towards Mr. Norfolk and the other staff and Major Parrish received no discipline for either incident with Mr. Norfolk. (ECF No. 52 ¶ 112.)

Mr. Norfolk alleges that he began reporting Major Parrish's racially charged comments to MVCC's Human Resources ("HR") department after they first began in 2014. (ECF No. 49 ¶ 23.) Mr. Norfolk spoke with GEO's HR Manager, Edwin Uhlig, on May 19, 2015, regarding Major Parrish's use of racially charged language towards him. (*Id.* ¶ 24.) That same day, after Mr. Norfolk reported Major Parrish's comments to Mr. Uhlig, Major Parrish confronted him and asked, "Why did you go ahead and report to HR on everything we discuss?" (ECF No. 52 ¶ 69.) After Mr. Norfolk stated that he felt targeted and harassed by Major Parrish's comments, Major Parrish responded: "If I was the Warden, your white ass would be fired for something like that." (*Id.*) Mr. Norfolk did not report this interaction with Major Parrish to HR for fear that Major Parrish would retaliate against him. (*Id.* ¶ 71.)

Major Parrish continued to make racially charged comments to Mr. Norfolk, and Mr. Norfolk reported those comments to Mr. Uhlig on June 4, 2015. (*Id.* ¶ 72.) During their conversation, Mr. Norfolk told Mr. Uhlig that he was considering obtaining legal counsel because of the vulgarities, profanities, and racial slurs that Major Parrish was directing at him. (*Id.* ¶ 90.) Later that day, Major Parrish again accosted Mr. Norfolk for reporting his behavior to Mr. Uhlig, stating: "What's going on? Why are you always discussing this with others? This is nobody else's business. You're gonna learn that reporting this ain't going nowhere, and I can get a piece of

white ass whenever I want, yours and the other supervisors.  I love white ass." (*Id.* ¶ 72.)  On

September 15, 2015, after meeting with A.W. Emerson, Major Parrish told Mr. Norfolk: "Man,

when the A.W. speaks, you sit your white ass in that seat and keep your mouth shut." (*Id.* ¶ 74.)

Additionally, in late 2015, Mr. Norfolk reported to Mr. Uhlig that Major Parrish responded to his

reports to HR by stating: "I ought to fire your white ass," "I love getting a piece of white ass,"

and "Sit your white ass in the seat." (*Id.* ¶ 76.)  Mr. Uhlig responded to Mr. Norfolk by laughing

and saying: "I'm sure he doesn't mean it that way." (*Id.*)  Mr. Uhlig never interviewed Major

Parrish about Mr. Norfolk's claims of racial discrimination and retaliation. (*Id.* ¶ 88.)

On December 1, 2015, Mr. Norfolk emailed Warden Shon Kuta about Major Parrish's

comments and behavior. (*Id.* ¶ 77.)  Warden Kuta then held a meeting with executive staff and

HR, including Mr. Uhlig, and the two discussed Mr. Norfolk's complaints of harassment. (*Id.*)

### B.  Defendant Disciplines Mr. Norfolk

On January 25, 2016, Defendant issued Mr. Norfolk a written discipline which outlined

that, on January 14, 2016, Mr. Norfolk violated GEO policy by permitting inmates to have

materials covering light fixtures, vents and windows in their cells. (ECF No. 49 ¶ 28.) Mr. Norfolk

disagreed with the discipline and felt that it was unjustified. (ECF No. 52 ¶ 28.) On January 29,

2016, after Mr. Norfolk questioned Major Parrish about the discipline, Major Parrish told Mr.

Norfolk: "Your ass is gonna learn, you take the order and let it go, do not get involved, you're

gonna get your white ass in a hard spot." (*Id.* ¶ 78.)

On January 27, 2016, Mr. Norfolk emailed Administrative Captain Richard Braniff, asking

if there was "something else I need to do" to schedule a required training on how to use GEO's

scheduling system. (*Id.* ¶ 103.) A.W. Emerson instructed Captain Braniff not to respond to Mr. Norfolk's email. (*Id.* ¶¶ 103–04.)

On February 5, 2016, Defendant issued Mr. Norfolk a written reprimand for poor performance, which stated that Mr. Norfolk had failed to schedule a training for GEO's scheduling system with Captain Braniff and had also failed to attend a mandatory meeting for security supervisors on January 26, 2016, and did not notify either Major Parrish or A.W. Emerson that he would not be in attendance. (ECF No. 49 ¶ 29.) Mr. Norfolk also disagreed with this discipline and felt that it was unjustified. (ECF No. 52 ¶ 29.)

After receiving the written reprimand on February 5, 2016, Mr. Norfolk spoke with Major Parrish and Captain Braniff, then went to A.W. Emerson's office to appeal the issue. (*Id.* ¶ 79.) During their conversation, A.W. Emerson told Norfolk to "stand down" and, after Norfolk stated that Major Parrish was harassing and targeting him, A.W. Emerson then screamed at Norfolk to "get out" of his office. (*Id.*)

Later that evening, Mr. Uhlig called Mr. Norfolk and told him that Warden Kuta had decided to put Norfolk on an indefinite unpaid administrative leave. (*Id.* ¶ 80.) Defendant asserts that Mr. Norfolk was placed on administrative leave because his interactions with Major Parrish, A.W. Emerson, and Captain Braniff on February 5, 2016, were inappropriate. (ECF No. 49 ¶ 33.) Mr. Norfolk asserts that he was placed on administrative leave to silence his complaints of harassment and discrimination. (ECF No. 52 ¶ 33.)

**C. Mr. Norfolk Files a Charge with the EEOC and Defendant Terminates Mr. Norfolk's Employment**

On February 10, 2016, Mr. Norfolk filed a charge of discrimination with the EEOC. (ECF No. 49 ¶ 37.) The EEOC issued a notice of Mr. Norfolk's charge to Defendant on February 24, 2016, and Defendant received Mr. Norfolk's EEOC charge by the end of the month. (*Id.* ¶¶ 38–39.) Both A.W. Emerson and Mr. Uhlig knew that Mr. Norfolk had filed a complaint with the EEOC before June of 2016. (ECF No. 52 ¶ 122, 128.)

Meanwhile, GEO's Office of Professional Responsibility ("OPR") conducted an investigation into the events of February 5, 2016. (ECF No. 49 ¶ 34.) After completing its investigation on April 25, 2016, OPR agreed that Mr. Norfolk's interactions with Major Parrish, A.W. Emerson, and Captain Braniff on February 5, 2016, violated GEO Policy 3.2.2, Standards of Employee Conduct. (ECF No. 49 ¶ 35.) That same day, Defendant issued Mr. Norfolk a disciplinary action form, terminating his employment for that violation. (*Id.* ¶ 36; ECF No. 52 ¶ 112.) Defendant asserts that Mr. Norfolk's conduct on February 5, 2016, was the sole reason for his termination. (ECF No. 49 ¶ 36.) Mr. Norfolk asserts that Defendant fired him for reporting Major Parrish's comments and for filing his EEOC complaint. (ECF No. 52 ¶ 36.)

In the April 25, 2016, disciplinary action form, OPR found that on February 5, 2016, Mr. Norfolk behaved in a loud, defiant, aggressive manner towards other employees, which included waving his arms around and pointing at staff with his index finger. (ECF No. 52-16 at 1.) OPR also found that Mr. Norfolk's voice was loud enough to be heard outside of A.W. Emerson's office. (*Id.*) Mr. Norfolk disputes this finding and asserts that did not raise his voice with his supervisors on February 5, 2016, and instead was emotionally distraught and had tears in his

eyes.  (ECF No. 52 ¶ 117.)   Mr. Norfolk also asserts that he did not react in a loud, defiant,

aggressive manner, or wave his arms around and point at staff.  (*Id.* ¶ 118.) Neither A.W. Emerson

nor Captain Braniff felt threatened by Mr. Norfolk during the meeting on February 5, 2016.  (*Id.*

¶¶ 110–11.)

### D. Captain Swarden Also Reports on Major Parrish and Files a Charge with the EEOC

Captain Walter Swarden, who is white, was one of Mr. Norfolk's supervisors; he also

reported to Major Parrish.  (ECF No. 52 ¶ 81.)  In December 2015, Major Parrish granted Captain

Swarden's request for a day off; later the same day, Major Parrish told Captain Swarden that he

could no longer have the requested day off.  (ECF No. 52-36 at 101:2–14.)  When Captain Swarden

met with Major Parrish to discuss the changed decision, Major Parrish told Captain Swarden,

"Get out of my office before I fire your white ass."  (ECF No. 52 ¶ 82.)  Captain Swarden reported

this comment to HR.  (*Id.*)

On December 29, 2015, Captain Swarden told A.W. Emerson that Major Parrish was

discriminating against him and Mr. Norfolk because they were white.  (ECF No. 52 ¶¶ 83, 99–

100.)   Specifically, Captain Swarden told A.W. Emerson that Major Parrish was treating

Lieutenant McDougald, an African American, more favorably than white correctional officers by

not disciplining Lieutenant McDougal for infractions and giving him more time off from work.

(*Id.*)  A.W. Emerson did not report this conversation to Mr. Uhlig or HR.  (*Id.* ¶ 101.) Captain

Swarden reported Major Parrish's alleged discrimination to GEO's anonymous tip hotline.  (*Id.* ¶

85.)   Mr. Uhlig could not recall whether he investigated Captain Swarden's claim of

discrimination by Major Parrish.  (*Id.*)

In March of 2016, Captain Swarden filed a charge with the EEOC against Defendant, alleging that Major Parrish had racially discriminated against him. (*Id.*) After Defendant received notice of Captain Swarden's EEOC complaint, A.W. Emerson called Captain Swarden into his office and told him that "a true leader does not file an EEOC complaint." (*Id.* ¶ 86.) A.W. Emerson also told Captain Swarden that "maybe you should start looking for other employment." (*Id.*) Captain Swarden resigned in 2017 and states that he did so because of Major Parrish and Defendant's response to his complaints. (ECF No. 52-36 at 127:2–10.)

### E.  Defendant Terminates Mrs. Norfolk's Employment

Mrs. Norfolk was hired as a Case Manager in January 2006 and was promoted to a Unit Manager in June 2013. (ECF No. 49 ¶¶ 8–9.) A.W. Emerson became Mrs. Norfolk's supervisor at the end of 2014 and remained her supervisor until he left MVCC in May 2016. (ECF No. 52 ¶ 127.)

On June 10, 2016, Warden Kuta, A.W. Charis Proud, and HR representative Edward Kuhstos met with Mrs. Norfolk. (ECF No. 49 ¶ 49.) Defendant asserts that Warden Kuta stated that he had received a series of reports related to Mrs. Norfolk's job performance and was therefore placing her on administrative leave, pending a final review of the reports. (ECF No. 49 ¶ 50.) Mrs. Norfolk asserts that she was called into the meeting unexpectedly and placed on unpaid administrative leave with no justification or reasoning given. (ECF No. 52 ¶¶ 50, 130.) She states that she had no knowledge before the meeting that anyone at MVCC had any concerns about her performance. (*Id.*)

On June 16, 2016, Mrs. Norfolk received a disciplinary action form that stated Defendant was terminating her employment for poor performance. (ECF No. 49 ¶ 51.) The disciplinary

action form referenced three events as the basis for why Defendant was terminating Mrs. Norfolk's employment: (1) failing to report to her supervisor that correctional officers were upsetting inmates by turning the lights on and off in the housing pods on April 14, 2016; (2) failing to follow up on a reported anonymous inmate complaint to her supervisor or executive staff on April 28, 2016; and (3) failing to notify executive staff of an issue between inmates regarding televisions in her unit on May 10, 2016. (*Id.* ¶¶ 52–55.) Mr. Uhlig prepared the document and A.W. Emerson supplied him with the information it contained. (ECF No. 52 ¶ 137.) Mr. Uhlig credited A.W. Emerson's version of the events over Mrs. Norfolk's version. (*Id.* ¶ 150.) Mrs. Norfolk asserts that the disciplinary action form is the only document detailing her alleged failures to report. (*Id.* ¶ 140.)

Mrs. Norfolk contends that she timely reported those events to management and that A.W. Emerson falsified the information in the disciplinary action form. (ECF No. 52 ¶¶ 52, 56.) At her termination, she told Mr. Uhlig that the allegations were false and that A.W. Emerson never addressed the three incidents with her. (*Id.*) Mr. Uhlig told her she could appeal the decision, which she did, asserting again that A.W. Emerson falsified the information in the disciplinary action form. (*Id.* ¶ 132.) Warden Kuta denied her appeal in a memorandum issued on July 20, 2016, but Warden Kuta did not prepare the memorandum; Mr. Uhlig did. (*Id.* ¶¶ 132, 145, 151.) Mrs. Norfolk asserts that Warden Kuta rubber-stamped the document Mr. Uhlig prepared and did not investigate her assertions. (*Id.* ¶ 151.)

## IV.    Procedural Background

On November 1, 2017, Plaintiffs filed the Complaint, which was subsequently amended twice. (ECF Nos. 1, 11, 18.) Defendant answered the Second Amended Complaint on April 23,

2018. (ECF No. 21.) Defendant moved for summary judgment on November 22, 2019. (ECF No. 47.) Plaintiffs responded in opposition on May 1, 2019, (ECF No. 51) to which Defendant replied on January 10, 2020. (ECF No. 53.) Plaintiffs filed a sur-reply on January 20, 2020. (ECF No. 58.)

## V.      Legal Standard

This Court will grant summary judgment "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Melrose, Inc. v. Pittsburgh*, 613 F.3d 380, 387 (3d Cir. 2010) (quoting *Ruehl v. Viacom, Inc.*, 500 F.3d 375, 380 n.6 (3d Cir. 2007)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). There is a genuine issue of fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005). Material facts are those that affect the outcome of the trial under governing law. *Anderson*, 477 U.S. at 248. The Court's role is "not to weigh the evidence or to determine the truth of the matter, but only to determine if the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party." *Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 581 (3d Cir. 2009). In deciding a summary judgment motion, this Court "'must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor.'" *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 278 (3d Cir. 2000) (quoting *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994)).

The moving party bears the initial responsibility of stating the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If the moving party meets this burden, the party opposing summary judgment "may not rest upon the mere allegations or denials" of the pleading, but

"must set forth specific facts showing that there is a genuine issue for trial." *Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 n.11 (1986)).  "For an issue to be genuine, the nonmovant needs to supply more than a scintilla of evidence in support of its position—there must be sufficient evidence (not mere allegations) for a reasonable jury to find for the nonmovant." *Coolspring Stone Supply v. Am. States Life Ins. Co.*, 10 F.3d 144, 148 (3d Cir. 1993); *see also Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (noting that a party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue").

## VI.  Discussion

Plaintiffs assert four claims in the Second Amended Complaint.  Mr. Norfolk asserts a racial discrimination claim, hostile work environment claim, and retaliation claim; Mrs. Norfolk asserts a third-party retaliation claim.[2]  The Court addresses each in turn.

### A.  Mr. Norfolk Can Show that Defendant Discriminated Against Him Because of His Race

Mr. Norfolk asserts that he was subject to discrimination because of his race.  Title VII makes it unlawful for an employer to discriminate against an individual with respect to his employment on the basis of the individual's race, color, religion, sex, or national origin.  42 U.S.C. § 2000e-2(a).  It is undisputed that during the period of time relevant to this case, Defendant was

---

[2] Plaintiffs assert these claims under both Title VII and the PHRA.  Courts analyze claims under both statutes in the same manner.  *See Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 791 n.9 (3d Cir. 2016) (retaliation); *Goosby v. Johnson & Johnson Med., Inc.*, 228 F.3d 313, 318 (3d Cir. 2000) (racial discrimination).  The Court references only the Title VII framework for brevity—if Defendant is entitled to summary judgment on Plaintiffs' Title VII claims, it is likewise entitled to summary judgment on Plaintiffs' respective PHRA claims.

an "employer" subject to Title VII's provisions, and Mr. Norfolk was an "employee" entitled to statutory protection from race-based discrimination.  § 2000e(b), (f).

Since this is an employment discrimination case in which Mr. Norfolk has presented no "direct evidence" of discrimination, the Supreme Court's framework in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981), provide the formulation for allocating the requisite burdens of proof and production for purposes of the instant motion for summary judgment.[3]  In an employment discrimination case of this kind, the plaintiff must first establish a prima facie case of illegal discrimination. *McDonnell Douglas*, 411 U.S. at 802.  If the plaintiff establishes a prima facie case of discrimination, the defendant must articulate legitimate, non-discriminatory reasons for treating the plaintiff in an adverse manner.  *Id.* at 802–03.  If the defendant articulates legitimate, non-discriminatory reasons for the plaintiff's adverse treatment, the plaintiff must demonstrate that the reasons given by the defendant for such treatment are merely a pretext for unlawful employment discrimination.  *Id.* at 804–05.

### 1.  The Parties' Arguments

Defendant asserts that Mr. Norfolk cannot establish that Defendant treated him less favorably than others on the basis of his race.  (ECF No. 48 at 9.)  Mr. Norfolk cannot establish that Defendant treated a nonwhite, similarly situated employee more favorably than him.  (*Id.*)

---

[3] The *McDonnell Douglas-Burdine* burden-shifting framework does not apply in an employment discrimination case in which a plaintiff presents "direct evidence" of discrimination. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002).  "Direct evidence" of discrimination is evidence that is "so revealing of discriminatory animus that it is not necessary to rely on any presumption" from the plaintiff's prima facie case to shift the applicable burden of production to the defendant. *Starceski v. Westinghouse Electric Corp.*, 54 F.3d 1089, 1096 n.4 (3d Cir. 1995).  The evidence presented in this case does not constitute "direct evidence" of discrimination.

Mr. Norfolk cannot identify any similarly situated comparators who engaged in similar conduct for which Mr. Norfolk was terminated. (*Id.* at 11.) Additionally, Mr. Norfolk cannot show that Defendant's alleged poor treatment of him was because of his race because he alleges that both black and white employees were treated more favorably than him. (*Id.* at 11–12.)

Defendant asserts that even if Mr. Norfolk can establish a prima facie case of discrimination, it can show that it terminated Mr. Norfolk's employment for a legitimate, non-discriminatory reason. (*Id.* at 14.) He was terminated for violating GEO Policy by shouting at his supervisors and acting aggressively towards them on February 5, 2016, and Mr. Norfolk cannot show that this non-discriminatory reason for terminating his employment is pretextual. (*Id.* at 14–15.) Mr. Norfolk has no evidence that can show that his race was more likely than not a motivating or determining cause of Defendant's decision to terminate him. (*Id.* at 16.) Captain Swarden's testimony cannot establish pretext because his allegations, like Mr. Norfolk's, do not amount to racial discrimination. (*Id.* at 17.)

Mr. Norfolk responds that Defendant treated him differently than African American employees. (ECF No. 51 at 9.) There are numerous questions and credibility surrounding Mr. Norfolk's termination for the jury to decide, including whether Mr. Norfolk's race played any role in Defendant's decision to place him on administrative leave and then terminate him. (*Id.* at 14.) Mr. Norfolk can show weaknesses in Defendant's reasons for these actions. (*Id.* at 17.) Mr. Norfolk disputes A.W. Emerson's characterization of his behavior on February 5, 2016, and can show that he did not violate GEO Policy that day. (*Id.*) Additionally, Defendant's disparate treatment of black and white employees can show that race played a role in Defendant's decision to terminate him. (*Id.* at 18.)

### 2. Mr. Norfolk Can Establish a Prima Facie Case of Disparate Treatment

The plaintiff's burden of establishing a prima facie case of disparate treatment is not onerous. *Burdine*, 450 U.S. at 253. To establish a prima facie case of discrimination, the plaintiff must show that: (1) he is a member of a protected class; (2) he was subject to an adverse employment action; and (3) that the adverse employment action occurred under circumstances that give rise to an inference of unlawful discrimination. *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410–11 (3d Cir. 1999).[4]

Here, it is undisputed that Mr. Norfolk is a member of a protected class because he is white and that Mr. Norfolk's placement on administrative leave and his termination are the relevant adverse employment actions. Therefore, the Court must only determine whether Mr. Norfolk has shown that these actions give rise to an inference of unlawful discrimination.

At the prima facie stage, the "central focus" is on whether an employer has treated an employee less favorably than others on the basis of an illicit discriminatory criterion. *Howard v. Blalock Elec. Serv., Inc.*, 742 F. Supp. 2d 681, 701–02 (W.D. Pa. 2010). However, an inference of race-based discrimination cannot arise simply from an employee's subjective belief that his race somehow influenced the challenged employment action. *Id.* at 702. Instead, a plaintiff can establish a prima facie case of illegal discrimination by showing that he has received less favorable treatment than similarly situated employees who did not share his protected trait, *Pivirotto v.*

---

[4] The Court has determined that these three elements are the ones relevant to the present case. *See id.* at 411 (noting that the specific elements of a prima facie discrimination case generally "depend on the facts of the particular case" before the court and "cannot be established on a one-size-fits-all basis."); *see also Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 358 (1977) ("The importance of *McDonnell Douglas* lies, not in its specification of the discrete elements of proof there required, but in its recognition of the general principle that any Title VII plaintiff must carry the initial burden of offering evidence adequate to create an inference that an employment decision was based on a discriminatory criterion illegal under the Act.")

*Innovative Sys., Inc.*, 191 F.3d 344, 352–57 (3d Cir. 1999), or by showing that his race, color, or national origin was a "motivating factor" in the challenged employment action. *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 174 (2009) (citing 42 U.S.C. § 2000e-2(m)).

Similarly situated, comparator employees must be similarly situated in "all relevant respects." *Wilcher v. Postmaster Gen.*, 441 F. App'x. 879, 881–82 (3d Cir. 2011). This is a fact-intensive inquiry to be determined on a case-by-case basis. *Monaco v. Am. Gen. Assurance Co.*, 359 F.3d 296, 305 (3d Cir. 2004). Critical to this inquiry is whether the plaintiff's conduct that drew the adverse employment decision is "nearly identical" to that of the comparator who received differential treatment. *Doe v. Apria Healthcare Grp. Inc.*, 97 F. Supp. 3d 638, 645 (E.D. Pa. 2015).

Here, Mr. Norfolk can show that Defendant treated similarly situated, non-white employees more favorably. Specifically, Mr. Norfolk can show that Major Parrish violated GEO Policy 3.2.2 on multiple occasions by using profane and racially charged language towards him and other employees. He can also show that Major Parrish, who is African American, was treated more favorably because Defendant did not place Major Parrish on administrative leave or terminate him for his violations, which is what Defendant asserts it did to Mr. Norfolk for his conduct on February 5, 2016. Although Major Parrish was Mr. Norfolk's supervisor, GEO Policy applied to all employees, regardless of seniority. A jury could find that Major Parrish and Mr. Norfolk were similarly situated because they were both equally bound to follow the same code of conduct, the relevant point of comparison here. A jury could find that Mr. Norfolk's conduct for which he was terminated was "nearly identical" to Major Parrish's conduct, if not less egregious. Accordingly, Mr. Norfolk can establish a prima facie case for his disparate treatment claims under Title VII.

### 3. Defendant Has Put Forth Evidence that Permits a Jury to Find that Mr. Norfolk Was Terminated for Legitimate, Non-discriminatory Reasons

Once the plaintiff establishes a prima facie case of discrimination, the burden of production shifts to the defendant to rebut the presumption of discrimination through the introduction of admissible evidence indicating that the challenged employment action was taken for legitimate, non-discriminatory reasons. *Burdine*, 450 U.S. at 254–55. To sustain this burden, the defendant need not persuade the court that it was actually motivated by the proffered reasons because this inquiry does not involve a credibility assessment. *Id.* at 254; *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993). The defendant satisfies its burden of production, and rebuts the plaintiff's prima facie showing of discrimination, simply by introducing admissible evidence that, if taken as true, would permit a finding that the challenged employment action was taken for legitimate, non-discriminatory reasons. *St. Mary's Honor Ctr.*, 509 U.S. at 509.

The Court holds that Defendant has introduced evidence that can show that Mr. Norfolk was placed on administrative leave and then terminated because he violated GEO Policy by yelling at and acting aggressively towards A.W. Emerson, Major Parrish, and Captain Braniff on February 5, 2016. Accordingly, Defendant has satisfied its burden of production to show that its adverse employment actions were taken for non-discriminatory reasons.

### 4. Mr. Norfolk Can Show that Defendant's Reasons for Termination Are Pretextual

After the defendant meets its burden of production, the burden returns to the plaintiff to produce evidence from which a reasonable jury could find that the proffered reasons were pretextual. *Burdine*, 450 U.S. at 255–56. The plaintiff can show pretext by pointing to some evidence from which a factfinder could reasonably either: (1) disbelieve the employer's

articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action. *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994). The plaintiff can cast doubt on the employer's proffered reasons by pointing to evidence that shows weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in those reasons. *Id.* at 765. The plaintiff can show that the discriminatory reason was a motivating cause of the adverse employment action through evidence which can show that: (1) the employer has previously discriminated against him; (2) the employer has discriminated against other persons within the plaintiff's protected class or within another protected class; or (3) the employer has treated similarly situated persons not within the protected class more favorably. *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 645 (3d Cir. 1998). The rapidity with which an employer moves to place an employee on administrative leave and terminate him rather than take less severe disciplinary action may evidence pretext. *Sneed v. Swarthmore Coll.*, No. 16-cv-43, 2017 WL 3279231, at *2 (E.D. Pa. Aug. 2, 2017).

The Court holds that a reasonable jury could disbelieve Defendant's reasons for terminating Mr. Norfolk. Mr. Norfolk asserts that the disciplinary action form mischaracterizes his behavior on February 5, 2016, and OPR never heard his side of those events. OPR received their information through Mr. Uhlig, who was not present at the February 5, 2016, meeting, who in turn received his information from A.W. Emerson. A jury could hear Mr. Norfolk's version of that meeting and disbelieve A.W. Emerson's characterization of those events. A jury could find that Mr. Norfolk was complaining about Major Parrish's comments to him and that Defendant decided to take disciplinary action, of the highest degree, against only Mr. Norfolk for allegedly violating the same standards of conduct that Major Parrish did. Placing Mr. Norfolk on

administrative leave the same day as his alleged violation—before an investigation, and rather than taking less severe disciplinary actions, like a written reprimand—may evidence that Defendant's reasons for Mr. Norfolk's termination were pretextual.

The Court also holds that a reasonable jury could believe that Mr. Norfolk's race was more likely than not a motivating factor in his termination. Mr. Norfolk can show that Defendant has treated similarly situated persons not within his protected class more favorably, specifically Major Parrish. *See supra* Section VI.A.2. Examining the behavior of Mr. Norfolk and Major Parrish, which involve disputes of material fact, a jury could find that both Major Parrish and Mr. Norfolk violated GEO Policy 3.2.2 by not being respectful towards all MVCC staff and Defendant only disciplined Mr. Norfolk for the violations. Because Major Parrish is African American and Mr. Norfolk is white, a jury could find that the only difference between the two was their race and that race played a role in Defendant's decision to terminate Mr. Norfolk.

Accordingly, Mr. Norfolk can show that Defendant discriminated against him because of his race.

## B. Mr. Norfolk Can Show that Defendant Subjected Him to a Hostile Work Environment

Mr. Norfolk asserts that he was subjected to a hostile work environment because of his race. To establish a Title VII claim for employment discrimination due to a hostile work environment, a plaintiff must show that: (1) he suffered intentional discrimination because of race; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected him; (4) the discrimination would have detrimentally affected a reasonable person of the same

race in his position; and (5) there is a basis for vicarious liability. *Caver v. City of Trenton*, 420 F.3d 243, 262 (3d Cir. 2005). Defendant disputes only the first two elements.

### 1.   The Parties' Arguments

Defendant asserts that Mr. Norfolk's hostile work environment claim fails because he cannot show that he suffered racial discrimination and cannot show that any harassment was severe or pervasive. (ECF No. 53 at 8–9.) Six alleged comments over the course of approximately two years is not pervasive and Major Parrish's comments were not severe because they were not physically threatening nor interfered with his ability to do his job. (*Id.* at 9–10.)

Plaintiff responds that Defendant subjected him to a hostile work environment based on his race because Major Parrish repeatedly made racially charged and racially discriminatory comments to him. (ECF No. 51 at 9.) These comments were made regularly throughout 2014 and 2015 and negatively impacted Mr. Norfolk. (*Id.*)

### 2.   Plaintiff Can Show that Defendant Subjected Him to Severe or Pervasive Racial Harassment

Harassment is severe or pervasive within the meaning of Title VII when it alters the plaintiff's conditions of employment and creates an abusive working environment. *Walton v. Mental Health Ass'n. of Se. Pa.*, 168 F.3d 661, 667 (3d Cir. 1999). Severity and pervasiveness are alternative possibilities: some harassment may be severe enough to contaminate an environment even if not pervasive; other, less objectionable, conduct will contaminate the workplace only if it is regular and pervasive. *Castleberry v. STI Grp.*, 863 F.3d 259, 264 (3d Cir. 2017). In determining whether harassment is sufficiently severe or pervasive to give rise to a Title VII action, courts must look at the totality of the circumstances, including: (1) the frequency of the discriminatory

conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance. *Caver*, 420 F.3d at 262–63. Determining whether an employee suffered a sufficiently severe or pervasive environment to prevail on a hostile work environment claim is generally unsuited for summary judgment because that determination is "quintessentially a question of fact." *Quick v. GEO Grp., Inc.*, No. 3:18-cv-93, 2020 WL 532343, at *14 (W.D. Pa. Feb. 3, 2020).

Here, a reasonable jury could find that Mr. Norfolk suffered from severe or pervasive harassment at MVCC because of his race.  Although solely being subjected to comments like "white ass" may not be enough to create a hostile work environment, that is not the extent of the comments presented here.  In several of Major Parrish's comments to Mr. Norfolk, Major Parrish also threatens to fire Mr. Norfolk.  Specifically, Major Parrish told Mr. Norfolk: (1) "If I was the Warden, your white ass would be fired for something like that;" (2) "I ought to fire your white ass;" and (3) "You're gonna learn that reporting this ain't going nowhere, and I can get a piece of white ass whenever I want, yours and the other supervisors.  I love white ass."  The Third Circuit has recognized that a supervisor's use of racially charged language, accompanied by threats of termination, constitutes sufficiently severe conduct that could create a hostile work environment. *Castleberry*, 863 F.3d at 265. *Castleberry* is analogous to this case, where, on several occasions, Major Parrish made racially charged statements to Mr. Norfolk accompanied by threats of termination.  A reasonable jury could find that Major Parrish's comments were severe and frequent enough to create a hostile work environment for Mr. Norfolk.  Accordingly, Mr. Norfolk can show that Defendant subjected him to a hostile work environment because of his race.

### C. Mr. Norfolk Can Show that Defendant Retaliated Against Him Because He Complained About Being Subjected to Racial Discrimination

Mr. Norfolk asserts that he was subject to discrimination because of his complaints of harassment. Title VII makes it unlawful for employers to discriminate against an employee because he has reported unlawful harassment or filed a charge with the EEOC. 42 U.S.C. § 2000e-3(a). The *McDonnell Douglas* framework also governs Title VII retaliation claims. *Moore v. City of Philadelphia*, 461 F.3d 331, 342 (3d Cir. 2006). If the plaintiff first articulates a prima facie case of retaliation, the employer must then come forward with a legitimate, non-retaliatory reason for the adverse employment action. *Id.* If the employer produces a legitimate, non-retaliatory reason, the Plaintiff then shoulders the burden of proving that legitimate reason is pretextual, and that retaliation was the real reason for the adverse employment action. *Id.*

#### 1. The Parties' Arguments

Defendant asserts that Mr. Norfolk's retaliation claim fails because he cannot show a causal connection between his alleged protected activity and his termination. (ECF No. 48 at 18.) There is no temporal proximity between Mr. Norfolk's complaints of racial discrimination to Mr. Uhlig and Defendant's decision to place Mr. Norfolk on administrative leave and then terminate him. (*Id.* at 19–20.) Additionally, Mr. Norfolk cannot show a pattern of antagonism towards him between his alleged protected activity and administrative leave or termination. (*Id.* at 18.) Mr. Norfolk has failed to show that the animus Major Parrish harbored towards him was the result of Mr. Norfolk's protected conduct. (*Id.* at 21.)

Mr. Norfolk responds that he engaged in protected activity by reporting Major Parrish's racial discrimination and harassment to Defendant and filing a complaint of discrimination with

the EEOC. (ECF No. 51 at 10.) Defendant retaliated against Mr. Norfolk by terminating him and subjecting him to further harassment by Major Parrish. (*Id.*) The evidence presented is sufficient to establish a causal connection between Mr. Norfolk's protected activities and Defendant's retaliatory acts. (*Id.* at 13.) Defendant's reasons for the adverse employment actions taken against Mr. Norfolk are pretextual because the evidence shows that Defendant disfavored employment discrimination complaints. (*Id.* at 17.) Specifically, A.W. Emerson, who played a primary role in Mr. Norfolk's termination, stated that a "true leader does not file an EEOC complaint." (*Id.*) Additionally, there are questions of material fact about the nature of the February 5, 2016, meeting. (*Id.* at 4.) The jury could find that Defendant falsified the reasons for which it stated it terminated Mr. Norfolk and instead find that Defendant fired him because he was complaining about racial harassment and discrimination. (*Id.*)

### 2.   Mr. Norfolk Can Establish a Prima Facie Case of Retaliation

To establish a prima facie case of retaliation, a plaintiff must demonstrate: (1) he was engaged in protected activity; (2) the defendant took adverse employment actions against him; and (3) there was a causal connection between the adverse action and his protected activity. *Moore*, 461 F.3d at 340–41.

Here, Mr. Norfolk's protected activities were his complaints to Mr. Uhlig and A.W. Emerson about Major Parrish's racial comments and his 2016 filing of an EEOC charge. Specifically, his protected activity includes: (1) his complaint about Major Parrish to Mr. Uhlig on May 19, 2015; (2) his complaint to Mr. Uhlig on June 4, 2015; (3) his complaint to Mr. Uhlig on an unspecified date in late 2015; (4) his complaint to A.W. Emerson on February 5, 2016; and (5) his EEOC charge on February 10, 2016.

An adverse employment action under Title VII's antiretaliation provision is broader than its antidiscrimination provision; these adverse actions are not limited to discriminatory actions that affect the terms and conditions of employment. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006). Rather, an employer's adverse action is one that might dissuade a reasonable worker from making or supporting a charge of discrimination. *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 195 (3d Cir. 2015).

Termination and placement on administrative leave are adverse employment actions because these actions would dissuade a reasonable worker from making or supporting a charge of discrimination. Additionally, several of Major Parrish's comments to Mr. Norfolk are adverse employment actions. These comments include Major Parrish telling Mr. Norfolk on May 19, 2015, "Why did you go ahead and report to HR on everything we discuss?" and "If I was the Warden, your white ass would be fired for something like that," on June 4, 2015, "What's going on? Why are you always discussing this with others? This is nobody else's business. You're gonna learn that reporting this ain't going nowhere, and I can get a piece of white ass whenever I want, yours and the other supervisors. I love white ass," and on a date in late 2015, responding to Mr. Norfolk's complaint to HR by telling him "I ought to fire your white ass." These comments, coming from a supervisor, could dissuade a reasonable worker from making or supporting a charge of discrimination.

The remaining issue is whether Mr. Norfolk has shown a causal connection between his protected activity and the adverse actions he suffered. To show a causal connection at the prima facie stage, the plaintiff must produce sufficient evidence to raise the inference that his protected activity was the likely reason for the adverse employment action. *Carvalho-Grevious v. Del. State*

*Univ.*, 851 F.3d 249, 259 (3d Cir. 2017).  To establish a causal connection, a plaintiff must show either: (1) temporal proximity between the protected activity and the adverse employment action; or (2) ongoing evidence of antagonism.  *Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 288 (3d Cir. 2001).

The timing of an alleged retaliatory action must be "unusually suggestive" of retaliatory motive before a causal link will be inferred on temporal proximity alone.  *Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 760 (3d Cir. 2004).  Although there is no bright line rule as to what constitutes unusually suggestive temporal proximity, a gap of ten days between the protected activity and the adverse action is usually enough; a gap of three months is not.  *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 233 (3d Cir. 2007); *Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 189 (3d Cir. 2003).

If the timing of an adverse action is not "unusually suggestive," courts look to the evidence, as a whole, to determine if it is sufficient to raise an inference of retaliation.  *Farrell*, 206 F.3d at 280.  In considering the circumstances as a whole, courts look for any intervening antagonism by the employer, inconsistencies in the reasons the employer gives for its adverse action, and any other evidence suggesting that the employer had a retaliatory animus when taking the adverse action.  *Daniels*, 776 F.3d at 196.

Here, Mr. Norfolk can show unusually suggestive temporal proximity between some of his protected activities and Defendant's adverse employment actions.  After complaining to Mr. Uhlig about Major Parrish's racially charged comments on three days—May 19, 2015, June 4, 2015, and an unspecified date in late 2015—Major Parrish confronted Mr. Norfolk on those same days and told him "If I was the Warden, your white ass would be fired for something like that,"

"You're gonna learn that reporting this ain't going nowhere, and I can get a piece of white ass whenever I want, yours and the other supervisors," and "I ought to fire your white ass." Additionally, Major Parrish, in his statements, told Mr. Norfolk that he knew he was reporting his comments and behavior to Mr. Uhlig.  These comments, made on the same day as Mr. Norfolk's protected activity, suggest a causal link between the two.

Mr. Norfolk can also show an unusually suggestive causal connection between his February 5, 2016, complaint and his placement on administrative leave.  There are disputes of material fact concerning what occurred during the February 5, 2016, meeting.  Mr. Norfolk asserts that during the meeting, he complained about Major Parrish's discriminatory behavior to A.W. Emerson.  Later that same day, Defendant placed him on unpaid administrative leave.  Because these two events occurred on the same date, a jury could find this temporal proximity to suggest a causal relationship between the two.

Mr. Norfolk's termination occurred approximately three months after he was placed on administrative leave.  The timing of his termination, by itself, is not enough to raise a causal inference.  However, taken together with everything that occurred before, a jury could find a causal link between his termination and his protected activity.   After being placed on administrative leave, Mr. Norfolk filed a charge with the EEOC, which Defendant received notice of in late February 2016.  A.W. Emerson, knowing of the EEOC charge, may have harbored animus towards those who filed complaints of discrimination and provided inaccurate information regarding what happened at the February 5, 2016, meeting, which formed the basis for Mr. Norfolk's termination.  After learning that another employee filed a charge with the EEOC, A.W. Emerson told that employee, "[a] true leader does not file an EEOC complaint."  A

jury could find that A.W. Emerson's retaliatory animus infected Defendant's decision to terminate Mr. Norfolk. Accordingly, Mr. Norfolk can establish a prima facie case for his retaliation claim under Title VII.

### 3. Defendant Has Put Forth Evidence that Permits a Jury to Find that Mr. Norfolk Was Terminated for Legitimate, Non-discriminatory Reasons

The standard in assessing whether a defendant has met its burden of production to rebut the prima facie case is the same for retaliation claims as it is for disparate treatment claims. *See Moore*, 461 F.3d at 342. The Court finds that the non-discriminatory reasons asserted by Defendant for why Mr. Norfolk was placed on administrative leave and then terminated—that he violated GEO Policy on February 5, 2016—also apply to his retaliation claim.

However, Defendant has not produced any evidence to rebut Mr. Norfolk's prima facie case related to Major Parrish's comments to Mr. Norfolk after he complained to Mr. Uhlig about his behavior. Defendant only denies that Major Parrish made these comments, which creates a question of material fact as to whether these comments were made. Accordingly, the burden only shifts back to Mr. Norfolk to show that that Defendant's reasons for placing him on administrative leave and terminating him are pretextual.

### 4. Mr. Norfolk Can Show that Defendant's Reasons for Termination Are Pretextual

The plaintiff can show pretext by pointing to some evidence from which a factfinder could reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action. *Fuentes*, 32 F.3d at 764.

For the same reasons discussed above, *supra* Section VI.A.4, the Court holds that a reasonable jury could disbelieve Defendant's articulated legitimate reasons for Mr. Norfolk's termination. The Court also holds that a reasonable jury could find that Mr. Norfolk's complaints of racial discrimination and his EEOC charge were motivating factors in Defendant's decision to terminate him. A jury could find that A.W. Emerson falsified the information that went into the disciplinary action form justifying Mr. Norfolk's termination. Mr. Norfolk disputes his characterization of the February 5, 2016, meeting and asserts that no one felt threatened by him that day. A jury could find that Defendant, through A.W. Emerson, wanted to fire or silence anyone who complained to the EEOC about employment discrimination. After A.W. Emerson told Captain Swarden that a "true leader does not file an EEOC complaint," he also told Captain Swarden that he should think about looking for other employment. A jury could find that the disciplinary action form which led to Mr. Norfolk's termination was merely a pretext for firing him because he repeatedly complained about racial discrimination. Accordingly, Mr. Norfolk can show that Defendant retaliated against him for complaining about discrimination at MVCC.

### D. Mrs. Norfolk Can Show that Defendant Retaliated Against Her Because Mr. Norfolk Complained About Being Subjected to Racial Discrimination

Mrs. Norfolk alleges that Defendant placed her on administrative leave and then fired her because her husband filed a charge of discrimination with the EEOC. Title VII also makes it unlawful for employers to discriminate against an employee because another employee has reported unlawful harassment or filed a charge with the EEOC. *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 174 (2011) (citing 42 U.S.C. § 2000e-3(a)). However, not all third-party reprisals are actionable under Title VII; the third-party must be "within the zone of interests sought to be

protected by Title VII." *Id.* at 178.   To determine whether a third-party retaliation claim is actionable, courts examine the degree of the relationship of the third-party to the individual who engaged in protected activity. *Id.* at 175.   Although there is no bright line rule, the firing of a close family member will almost always be actionable under Title VII. *Id.*

The Court holds that Mrs. Norfolk is within the zone of interests sought to be protected by Title VII.   Like her husband, Mrs. Norfolk was an "employee" entitled to statutory protection from unlawful retaliation.   42 U.S.C. § 2000e(f).   She is the wife of Mr. Norfolk, who engaged in protected activity; taking adverse employment actions against her would dissuade a reasonable person in Mr. Norfolk's position from making or supporting a charge of racial discrimination.

Third-party retaliation claims, like all retaliation claims under Title VII, proceed under the *McDonnell Douglas* framework. *Thompson*, 562 U.S. at 174.   If the plaintiff first articulates a prima facie case of retaliation, the employer must then come forward with a legitimate, non-retaliatory reason for the adverse employment action. *Moore*, 461 F.3d at 342.   If the employer produces a legitimate, non-retaliatory reason, the plaintiff then shoulders the burden of proving that legitimate reason is pretextual, and that retaliation was the real reason for the adverse employment action. *Id.*

### 1.   The Parties' Arguments

Defendant asserts that Mrs. Norfolk's third-party retaliation claim fails because she cannot show a causal connection between Mr. Norfolk's alleged protected activity and her termination.   (ECF No. 48 at 22.)   She cannot show temporal proximity because Defendant knew of Mr. Norfolk's EEOC charge three months before placing her on administrative leave.   (*Id.* at 23.)   Additionally, she cannot show that she was targeted with disciplinary actions because of Mr.

Norfolk's EEOC charge because Mrs. Norfolk was previously disciplined on numerous occasions prior to Mr. Norfolk's filing of the EEOC charge. (*Id.* at 25.) Because she had a prior disciplinary record, the June 16, 2016, discipline could not have been motivated by Mr. Norfolk's filing of the EEOC charge. (*Id.* at 26.)

Plaintiffs respond that Defendant fired Mrs. Norfolk on falsified charges in further retaliation for Mr. Norfolk's complaints of discrimination. (ECF No. 51 at 12.) The evidence can show a causal connection between her termination and Mr. Norfolk's protected activity. (*Id.*) The timing of unfounded disciplines against Mrs. Norfolk shortly after Mr. Norfolk filed complaints with the EEOC is unusually suggestive of retaliatory motive. (*Id.* at 14.) Moreover, there are genuine disputes of material fact concerning those disciplines. (*Id.*) Defendant did not tell Mrs. Norfolk about the issues for which she was allegedly terminated before she was placed on administrative leave on June 10, 2016. (*Id.*)

### 2. Mrs. Norfolk Can Establish a Prima Facie Case of Retaliation

To establish a prima facie case of third-party retaliation, the plaintiff must demonstrate: (1) another worker engaged in protected activity; (2) the defendant took adverse employment actions against the plaintiff; and (3) there was a causal connection between the adverse action taken against the plaintiff and the other worker's protected activity. *Moore*, 461 F.3d at 340–41. The protected activity at issue was Mr. Norfolk's filing of an EEOC charge in February 2016 and the adverse employment actions were Mrs. Nofolk's placement on administrative leave and subsequent termination.

The Court holds that Mrs. Norfolk can establish a causal connection between her termination and Mr. Norfolk's protected activity. Although the timing of Mrs. Norfolk's

termination does not raise an inference of retaliation because it occurred more than three months after Mr. Norfolk filed an EEOC charge, the evidence, when looked at as a whole, is sufficient to raise an inference of retaliation. A.W. Emerson supplied Defendant with the information in the disciplinary action form which provided the basis for Mrs. Norfolk's termination. The move to terminate Mrs. Norfolk occurred only after Defendant learned that Mr. Norfolk had filed a charge of discrimination with the EEOC. A jury could find that A.W. Emerson's animus for Mr. Norfolk's filing of EEOC complaints infected Defendant's decision to terminate Mrs. Norfolk. Accordingly, Mrs. Norfolk can establish a prima facie case for her third party-retaliation claim.

### 3. Defendant Has Put Forth Evidence that Permits a Jury to Find that Mrs. Norfolk Was Terminated for Legitimate, Non-discriminatory Reasons

After the plaintiff establishes a prima facie case of retaliation, the burden of production shifts to the defendant to introduce admissible evidence that, if taken as true, would permit a finding that the challenged employment action was taken for legitimate, non-discriminatory reasons. *Moore*, 461 F.3d at 342.

The Court holds that Defendant has introduced evidence that can show that Mrs. Norfolk was placed on administrative leave and then terminated because of poor performance. A jury could find that Defendant terminated Mrs. Norfolk's employment because she: (1) failed to report to her supervisor that correctional officers were upsetting the inmates by turning the lights on and off in the housing pods on April 14, 2016; (2) failed to follow up on a reported anonymous inmate complaint to her supervisor or executive staff on April 28, 2016; and (3) failed to notify executive staff of an issue between inmates regarding the televisions in her unit on May 10, 2016.

Accordingly, Defendant has satisfied its burden of production to show that its adverse employment actions were taken for non-discriminatory reasons.

### 4.   Mrs. Norfolk Can Show that Defendant's Reasons for Termination Are Pretextual

The plaintiff can show pretext by pointing to some evidence from which a factfinder could reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action. *Fuentes*, 32 F.3d at 764.

The Court holds that a reasonable jury could disbelieve Defendant's articulated legitimate reasons for Mrs. Norfolk's termination. Mrs. Norfolk asserts that Defendant did not document her alleged infractions at the time they occurred and that the disciplinary action form is the only document detailing what allegedly happened. She disputes the factual account of those violations, asserting that she had in fact acted in accordance with GEO Policy. Defendant accepted A.W. Emerson's assertions that she violated GEO Policy without investigating further. A jury could find that these infractions did not actually happen, and that A.W. Emerson made up these violations as a way for Defendant to terminate her employment.

The Court also holds that a reasonable jury could find that Mr. Norfolk's EEOC charge was a motivating factor in Defendant's decision to terminate Mrs. Norfolk. A jury could find that A.W. Emerson falsified the information that went into the disciplinary action form to get rid of Mrs. Norfolk as a way to retaliate further against her husband. A jury could find that Defendant, through A.W. Emerson, wanted to harm employees who complained to the EEOC about employment discrimination. Defendant could cause further harm to Mr. Norfolk by also firing

his wife within a few months of his termination.  A jury could rely on all the evidence of A.W. Emerson's animus towards those who file EEOC complaints and conclude that that the disciplinary action form which led to Mrs. Norfolk's termination was merely a pretext for Defendant to further retaliate against Mr. Norfolk. Accordingly, Mrs. Norfolk can show that Defendant retaliated against her because her husband complained about discrimination at MVCC.

**VII. Conclusion**

For the forgoing reasons, the Court denies Defendant's Motion for Summary Judgment. An appropriate order follows.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

STEPHEN W. NORFOLK and )          Case No. 3:17-cv-204
BRANDY M. NORFOLK, )

)          JUDGE KIM R. GIBSON

Plaintiffs, )

)

v. )

)

THE GEO GROUP, INC., d/b/a )
MOSHANNON VALLEY )
CORRECTIONAL CENTER, )

)

Defendant. )

### ORDER

NOW, this _15th_ day of April, 2020, upon consideration of Defendant's Motion for Summary Judgment (ECF No. 47), and for the reasons set forth in the accompanying Memorandum Opinion, it is **HEREBY ORDERED** that said Motion is **DENIED**.

**BY THE COURT:**

_____

**KIM R. GIBSON**
**UNITED STATES DISTRICT JUDGE**